**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
——————————————————————

**UNITED STATES OF AMERICA,**

                         **Plaintiff,**

 **v.**

                                                          **17-CR-248G**

**GARY L. HANNOLD, II,**

                         **Defendant.**
——————————————————————

## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. Frank P. Geraci, Jr., in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

        The defendant, Gary L. Hannold, II ("the defendant"), is charged in a multi-count indictment with having violated Title 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(B), 841(b)(1)(C), 841(b)(1)(D), and 841(B)(1)(E). Dkt. #11. He has filed a motion wherein he seeks suppression of the evidence seized during an automobile stop on March 23, 2017 and on August 11, 2017. Dkt. #15. The government filed its opposition to this motion. Dkt. #16. An evidentiary hearing on the motion was held by this Court and a transcript of the evidentiary hearing was filed. Dkt. #33. Thereafter, post-hearing memoranda were filed by the defendant and the government. Dkt. #s 36 and 35 respectively. The matter was then take under advisement by this Court.

# FACTS[1]

## A. The Automobile Stop and Search on March 23, 2017

Chautauqua County Deputy Sheriff Chad Wright was on patrol duty on March 23, 2017 and as part of his patrol, he was driving on Whallon Road between 3:30 a.m. and 4:00 a.m. when he observed "two vehicles parked on the north side of [Whallon] road, off the pavement on the shoulder." One was a gray Ford pickup and the other was a dark green Chevrolet Camaro and across the road from these two vehicles was a large, dark, wooded area. When he looked over toward the wooded lot on Whallon Road, he observed "what looked like white or bright colored lights" which were "moving around" and looked "to be people holding cell phones." T. 18, 42-43.

Deputy Wright "recognized the pickup truck [as] belonging to an individual named Jason Goodwill that [he] had previously arrests (sic) with" for "narcotics possession." He ran a plate check on the Chevrolet Camaro and determined that it was registered to an Odea Hannold. T. 14-17. Deputy Wright then drove a short distance down Whallon Road and parked his patrol car because he wanted to "investigate further" as to what might be transpiring or occurring on the wooded lot and he "contacted dispatch" and asked for a second car to assist him. T. 18-19. Shortly thereafter, the Chevrolet Camaro came down the road towards him and he "activated [his] overhead lights and flagged the individual down" on "suspicion" that something was going on at the wooded lot. T. 21, 48-49. The driver of this vehicle was the defendant

---

[1] The facts are taken from the transcript of testimony given in the evidentiary hearing which are referenced by the designation "T" followed by the appropriate page numbers.

and the passenger in the vehicle was identified as Robert Hannold.  T. 22-23.

Deputy Wright asked the defendant "what was going on down at the wooded lot" and the defendant stated that "his friend was showing him around the property."  Deputy Wright "had some concerns about that" [explanation] because of the "hour of night" and asked the defendant who the "friend was that was showing him around the property" but the defendant "didn't immediately have an answer."  Deputy Wright again asked the defendant "who else he was down there with" and the defendant gave him the name of Jamie Goodwill whom the deputy knew as the brother of Jason Goodwill.  T. 17, 23.  Deputy Wright concluded that it "seemed highly improbable that [these individuals] would be just looking over, walking through property at nearly 4:00 a.m."  T. 24.  He then asked the defendant to step out of his vehicle and as the defendant was doing so, Deputy Wright observed "on the floorboard of the [defendant's] vehicle what appeared to be a flashlight at first glance" which he believed had a secondary function as a stun gun."  T. 26-27.  Deputy Wright asked the defendant about the flashlight and when the defendant reached for it, he "received an electric shock" which "dropped him down."  T. 27.  Because it was a stun gun, Deputy Wright told the defendant that he was being arrested and placed him in handcuffs.  T. 33-34.  About this time, Deputy Kapuscinski arrived on the scene to assist Deputy Wright and a search of the defendant's vehicle was conducted because of the finding of the stun gun in the vehicle.  T. 29.  What appeared to be "crack cocaine" was found in the center console area of the vehicle and a second stun gun was found "underneath the driver's seat."  T. 30.  Deputy Wright also found a "black canvas bag" in the rear seat area of the

vehicle and detected a "very strong odor of unburned marijuana."  T. 31-32.  A sergeant of the Chautauqua County Sheriff's Office arrived on the scene and either he or Deputy Kapuscinski opened the black canvas bag and found "marijuana and other various narcotics" such as methamphetamine and crack cocaine in it.  Also seized in the vehicle search were baggies, a digital scale and pipes.  T. 32-33.

### B.  The Motorcycle Stop and Backpack Search on August 11, 2017

Deputy David Kapuscinski was on road patrol in Sherman, New York on August 11, 2017.  While parked on Park Street in the Village of Sherman at approximately 1:30 a.m., he observed "a dim, almost like a headlight was out; bulb was kind of illuminated, but there was no light coming from it, traveling toward [him] on Park Street."  He also heard "like a loud banging, popping noise, sounded like a muffler backfiring."  T. 57.  It was a motorcycle, and when it passed him, he "pulled out, turned [his] emergency lights and siren on and the [motorcycle] pulled into the driveway of a house at 192 Park Street.  T. 57-58.  This house, 192 Park Street "was on the radar for narcotics dealing."  T. 88.  Deputy Kapuscinski pulled his patrol car behind the stopped motorcycle and as he was exiting his patrol car, he observed "the operator of the motorcycle [take] his helmet and his backpack off and quickly toss [ ] it, [the backpack] to the side over into weeds, as if he was trying to hide the backpack from" Deputy Kapuscinski.  Deputy Kapuscinski recognized the motorcycle operator as the defendant since he had previously been involved in the arrest of the defendant on March 23, 2017.  T. 59-60, 65, 88.

4

Deputy Kapuscinski asked the defendant whether the backpack belonged to him and why he was trying to hide it from the deputy.  The defendant denied ownership of the backpack and "continuously tried to keep himself between [Deputy Kapuscinski] and the bag."  The defendant's explanation to Deputy Kapuscinski as to "who he was with and where he was coming from kind of changed."  T. 65.  Because it appeared to Deputy Kapuscinski that the defendant was trying to hide the backpack and kept changing his story, he became suspicious of the defendant's activities.  T. 89, 92, 97-98.

While Deputy Kapuscinski was engaged in conversation with the defendant, Kasey Erhard appeared on the scene.  T. 68-69.  Initially Erhard told Deputy Kapuscinski that the backpack was his but the deputy did not believe him because Erhard described the wrong location as to where the backpack was since Kapuscinski "never lost sight" of the backpack after the defendant had removed it from his person and threw it in the weeds.  T. 78.

Eventually, Deputy Kapuscinski picked up the backpack that he had seen the defendant throw into the weeds, and upon doing so smelled the odor or marijuana.  T. 69, 93, 97.  When Deputy Kapuscinski picked up the backpack, the defendant "tried to grab the bag" and it then became an "officer safety thing" so Deputy Kapuscinski "put the bag down" and "detained the [defendant]" while "he was trying to snatch the bag out of [the deputy's] hand."  The defendant was placed in the back of the deputy's patrol car.  T. 98.  Thereafter, Deputy Kapuscinski "opened up the bag and found marijuana

5

along with a white substance that appeared to be crystal methamphetamine."  T. 69.  A further search of the backpack resulted in the seizure of "clear plastic baggies with the white substances, methamphetamine, some paraphernalia, suboxone strips, pipes for smoking marijuana and methamphetamine, packaging material and marijuana.  T. 71. *See* Government Exhibits 2A-2I.

In addition to charging the defendant with criminal possession of controlled substances, Deputy Kapuscinski charged the defendant with violating Sections 375(2)(a)(1) ("NO/INADEQUATE LIGHTS"), 375(31) ("INADEQUATE MUFFLER") and 509(2) (OPERATING OUT OF CLASS") and issued Uniform Traffic Tickets for same.  *See* Government Exhibit 3501 I.

## DISCUSSION AND ANALYSIS

Having observed the demeanor of Deputies Wright and Kapuscinski while they testified under oath in the evidentiary hearing and considering their testimony, I find that both were credible in their testimony and therefore I accept that testimony fully.

### A.  The Automobile Stop and Search of March 23, 2017

The defendant argues that Deputy Wright stopped the defendant's automobile because of "alleged suspicions based on a "citizen 'complaint' along with the time of day" and because of the deputy's "belief that the individuals there [the wooded

lot] weren't associated with the property" as well as "the distance from the car owner's residence to the lot, and the distance from the lot owner's residence to the lot."   Dkt. #36, p. 13.  The defendant asserts that the alleged information provided by an "anonymous civilian" regarding suspicious vehicles in the neighborhood was "unsubstantiated, stale, attenuated, and lacking any sort of specificity as to criminal behavior" and therefore could not provide a legitimate basis for creating "reasonable suspicion required under the Fourth Amendment in order to constitutionally seize the defendant.  Dkt. #36, p. 15.  As a result, the defendant argues that "no reasonable suspicion or probable cause existed justifying the stop and detention of the defendant" since "any suspicion was speculative and based on pure conjecture on the part of Wright" and therefore "the evidence subsequently seized must be suppressed as fruit of the poisonous tree."  Dkt. #36, p. 16.

        In rejecting this argument of the defendant, I have not placed any weight on the "information" provided by an "anonymous citizen" a month prior to March 23, 2017 since the circumstances of March 23, 2017, considered in their totality and known by Deputy Wright, justified the stopping of defendant's automobile as a *Terry* stop.

> The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.  *Terry v. Ohio*, 392 US 1, 9, 20 L Ed 2d 889, 88 S Ct 1868 (1968); *United States v. Cortez*, 449 US 411, 417, 66 L Ed 2d 621, 101 S Ct 690 (1981). Because the "balance between the public interest and the individual's right to personal security," *United States v. Brignoni-Ponce*, 422 US 873, 878, 45 L Ed 2d 607, 95 S Ct

7

2574 (1975), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "may be afoot," *United States v. Sokolow*, 490 US 1, 7, 104 L Ed 2d 1, 109 S Ct 1581 (1989) (quoting *Terry, supra*, at 30, 20 L Ed 2d 889, 88 S Ct 1868). See also *Cortez*, 449 U.S., at 417, 66 L Ed 2d 621, 101 S Ct 690 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity").

When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.  See, *e.g., id.,* at 417-418, 66 L Ed 2d 621, 101 S Ct 690.  This process allows officers to draw on their own experience and specialized training to make inferences from the deductions about the cumulative information available to them that "might well elude an untrained person."  *Id*., at 418, 66 L Ed 2d 621, 101 S Ct 690.  See also *Ornelas v. United States*, 517 US 690, 699, 134 L Ed 2d 911, 116 S Ct 1657 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers). Although an officer's reliance on a mere "hunch" is insufficient to justify a stop, *Terry, supra*, at 27, 20 L Ed 2d 889, 88 S Ct 1868, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, *Sokolow, supra*, at 7, 104 L Ed 2d 1, 109 S Ct 1581.

Our cases have recognized that the concept of reasonable suspicion is somewhat abstract.  *Ornelas, supra*, at 696, 134 L Ed 2d 911, 116 S Ct 1657 (principle of reasonable suspicion is not "finely-tuned standar[d]"); *Cortez, supra*, at 417, 66 L Ed 2d 621, 101 S Ct 690 (the cause "sufficient to authorize police to stop a person" is an "elusive concept"). But we have deliberately avoided reducing it to "a neat set of legal rules," *Ornelas, supra*, at 695-696, 134 L Ed 2d 911, 116 S Ct 1657 (quoting *Illinois v. Gates*, 462 US 213, 232, 76 L Ed 2d 527, 103 S Ct 2317 (1983)).  In *Sokolow*, for example, we rejected a holding by the Court of Appeals that

8

distinguished between evidence of ongoing criminal behavior and probabilistic evidence because it "create[d] unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment."  490 US, at 7-8, 104 L Ed 2d 1, 109 S Ct 1581.

*United States v. Arvizu, 534 U.S. 266, 273-274 (2002)*; See also: United States v.

Bayless, 201 F.3d 116, 132-133 (2d Cir. 2000).


Likewise, in addressing the legal standard established in *Terry v. Ohio*, the

Court of Appeals for the Second Circuit has stated:

> *The governing legal standard - Terry v. Ohio*, 392, U.S. 1, 8, S.Ct. 1868, 20 L.Ed.2d 889 (1968), first delineated the contours of a limited investigative stop, now frequently called a *Terry* stop.  *Terry* held that a police officer can stop and briefly detain a person if the officer has a reasonable suspicion "that criminal activity may be afoot."  *Id.* at 30, 88 S.Ct. 1868.  In deciding whether a *Terry* stop is reasonable under the Fourth Amendment, a reviewing court must determine, first, "whether the officer's action was justified at its inception, and [second], whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *Id*. at 20, 88 S.Ct. 1868.  It is the first prong of the *Terry* test that is at issue here.
>
> This circuit has characterized the quantum of suspicion necessary under the first prong of *Terry* as "reasonable suspicion, based on specific and articulable facts, of unlawful conduct."  *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993)) (internal quotation marks omitted).  Because a *Terry* stop impinges to a lesser extent on Fourth Amendment concerns than does an arrest or search, the stricter standard of probable cause does not apply.  *See, e,g, United States v. Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581 (quoting *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984))), and that "inchoate suspicion or mere hunch" will not suffice, *id*. at 1010.  Reasonable suspicion is an objective standard; hence, the subjective

> intentions or motives of the officer making the stop are irrelevant. *See id.*
>
> When evaluating the reasonableness of a *Terry* stop, the reviewing court must consider "the totality of the circumstances" surrounding the stop. *Sokolow*, 490 U.S. at 8, 109 S.Ct. 1581 (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). And the court must evaluate those circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Oates*, 560 F.2d 45, 61 (2d Cir. 1977). In the case of a suspected drug transaction, this circuit has held that the reasonable suspicion inquiry must ask if "the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer." *Glover*, 957 F.2d at 1010 (quoting *United States v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991)). But a district court must not merely defer to the police officer's judgment. "The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868.

*United States v. Bayless*, 201 F.3d 116, 132-133 (2d Cir. 2000).

The facts and circumstances viewed in their totality that are germane to the issue of "reasonable suspicion" justifying the *Terry* stop of the defendant's automobile on March 23, 2017 are as follows.

Deputy Wright was on legal patrol duty as a member of the Chautauqua County Sheriff's Department on Whallon Road between 3:30 a.m. and 4:00 a.m. on March 23, 2017 when he observed "two vehicles parked on the north side of the road,"

one of which he recognized as being a Ford pickup truck that was "primarily operated by Jason Goodwill," an individual whom he had previously arrested for "narcotics possession" on "two separate occasions." T. 14-16. At this same time, Deputy Wright observed "what looked like white or bright colored lights" which were "moving around" and looked "to be people holding cell phones" across the way in a large wooded lot. T.18 , 42-43. Deputy Wright then ran a plate check on the other vehicle parked on the road and determined it was registered to an Odea Hannold who resided in Bemus Point, Chautauqua County which is approximately eight (8) to ten (10) miles away from the place on Whallon Road where the vehicle was parked. T. 17. As a result of these observations, the lateness of the hour and knowledge about Jason Goodwill being involved in "narcotics possession," Deputy Wright decided to further investigate this matter so he drove his patrol car a short distance down Whallon Road and parked his vehicle in a direction facing where the two vehicles were parked on Whallon Road. T. 19.

The circumstances as observed by Deputy Wright, a trained police officer having knowledge of an individual whom he had previously arrested on "two separate occasions" for "narcotics possession" and the lateness of the hour certainly provided "reasonable suspicion" for him to believe that "criminal activity may be afoot" which justified further investigation on his part. When he observed the Chevrolet Camaro driving towards him a short time later, he had legal justification to make a *Terry* stop of

this vehicle.  As the United States Supreme Court noted, "law enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity."  *United States v. Hensley*, 469 U.S. 221, 226 (1985); *United States v. Lucky*, 569 F.3d 101 (2d Cir. 2009).

In conducting his "further investigation," Deputy Wright could legally question the defendant about "what was going on down at the wooded lot."  The defendant's response that "his friend was showing him around the property" certainly created further suspicions considering that this "showing of property" was occurring around 3:30 a.m. to 4:00 a.m. in total darkness.  When asked who the friend was, the defendant did not immediately reply causing the deputy to ask the question again.  This time the defendant identified the friend as being Jamie Goodwill who the deputy knew to be the brother of Jason Goodwill.  T. 23-24.

During the course of his conversation with the defendant, Deputy Wright observed the defendant "on multiple occasions" put his hand in his "jacket pocket" and this caused Deputy Wright concern for his safety.  As a result, he asked the defendant to step out of the vehicle so that they could continue the discussion "outside of the vehicle." T. 25-26.  As part of the *Terry* stop, Deputy Wright could lawfully require the defendant to exit his vehicle.  *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *Maryland v. Wilson*, 519 U.S. 408, 415 (1997); *Mollica v. Volker*, 229 F.3d 366, 369 (2d

Cir. 2000).  As the defendant was exiting his vehicle, Deputy Wright observed "what

appeared to be a flashlight" on the "driver floor – essentially where the driver's feet are."

T. 26.  Deputy Wright "had prior dealings with flashlights that have a secondary function

as a stun gun" and he "clearly recognized" this flashlight to be a stun gun.  T. 33.  When

Deputy Wright asked the defendant about the flashlight, the defendant claimed that it

was just that.  However, when he reached for it as he got out of the vehicle, he received

an "electric shock" which "dropped him down."  T. 27.  Because the defendant was in

possession of a "stun gun," Deputy Wright placed him under arrest and handcuffed him.

T. 28, 33.  Since the "stun gun" was in plain sight when the defendant was exiting his

vehicle, Deputy Wright could legally seize it as a weapon or contraband.  As the Second

Circuit Court of Appeals has stated:

> [A] police officer's looking through the windows into the
> vehicle from outside, even when shining a flashlight to
> illuminate the inside of the vehicle, does not constitute a
> "search" of the vehicle within the meaning of the Fourth
> Amendment.  *See New York v. Class*, 475 U.S. 106, 118,
> 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (locations inside an
> automobile, in plain view of persons outside the automobile,
> are not "subject to a reasonable expectation of privacy");
> *Texas v. Brown*, 460 U.S. 730, 740, 103 S.Ct. 1535,
> 75 L.Ed.2d 502 (1983) ("There is no legitimate expectation
> of privacy shielding that portion of the interior of an automobile
> which may be viewed from outside the vehicle by either
> inquisitive passerby or diligent police officers.")
> (citations omitted) (plurality of four Justices; other five
> Justices concurring in judgment and disagreeing on unrelated
> grounds); *id*. at 739-40, 103 S.Ct. 1535 ("It is . . . beyond
> dispute that [the officer's] action in shining his flashlight

> to illuminate the interior of [defendant's] car trenched
> upon no right secured . . . by the Fourth Amendment.");
> *United States v. Ocampo*, 650 F.2d 421, 427 (2d Cir. 1981)
> (holding that, even though a police officer needed to use
> a flashlight to illuminate the inside of a lawfully stopped car,
> the item glimpsed was "in 'plain view'").

*Mollica v. Volker*, 229 F.3d 366, 369 (2d Cir. 2000).

The Fourth Amendment does not require the police to obtain a search warrant to search an automobile when they have probable cause to believe it contains contraband or evidence of criminal activity. Once Deputy Wright observed the "stun gun" in the defendant's automobile and witnessed the defendant being shocked by it, he had probable cause to arrest the defendant and conduct a search of the defendant's vehicle without a search warrant. *Arizona v. Gant*, 556 U.S. 332, 357 (2009); *Thornton v. United States*, 541 U.S. 615, 632 (2004); *California v. Acevedo*, 500 U.S. 565, 580 (1991); *Carroll v. United States*, 267 U.S. 132, 158-159 (1929); *United States v. Ross*, 456 U.S. 798, 809 (1982); *Maryland v. Dyson*, 527 U.S. 465, 466 (1999); *United States v. Johns*, 469 U.S. 478, 483-484 (1985); *Chambers v. Maroney*, 399 U.S. 42, 46-47 (1970).

It is also pointed out that at the time of the arrest of the defendant, his vehicle was "readily mobile," and because of that, the police officers were legally justified as well in conducting a complete search of the defendant's vehicle.

14

*Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996).  As the Court of Appeals for the

Second Circuit has stated:

> We begin our inquiry on well-tread ground. "[S]earches
> conducted outside the judicial process, without prior approval
> by judge or magistrate, are per se unreasonable under the
> Fourth Amendment-subject only to a few specifically
> established and well-delineated exceptions." Katz v. United
> States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576
> (1967) (footnote omitted). One such exception is the
> "automobile exception." It permits law enforcement to conduct
> a warrantless search of a readily mobile vehicle where there
> is probable cause to believe that the vehicle contains
> contraband. E.g., Pennsylvania v. Labron, 518 U.S. 938, 940,
> 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996) (per curiam).
> Where the probable cause upon which the search is based
> "extends to the entire vehicle," the permissible scope of a
> search pursuant to this exception includes " 'every part of the
> vehicle and its contents [including all containers and
> packages] that may conceal the object of the search.' " United
> States v. Harwood, 998 F.2d 91, 96 (2d Cir.1993) (alteration
> in original) (quoting United States v. Ross, 456 U.S. 798, 825,
> 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)); see also California v.
> Acevedo, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).

> The Supreme Court has relied on two rationales to explain
> the reasonableness of a warrantless search pursuant to the
> automobile exception: vehicles' inherent mobility and citizens'
> reduced expectations of privacy in their contents. See, e.g.,
> California v. Carney, 471 U.S. 386, 391, 105 S.Ct. 2066, 85
> L.Ed.2d 406 (1985); see also United States v. Howard, 489
> F.3d 484, 492 (2d Cir.2007). One of the seminal cases
> defining the exception, Carroll v. United States, emphasized vehicles' mobility:

> [T]he guaranty of freedom from unreasonable searches and
> seizures by the Fourth Amendment has been construed,

practically since the beginning of the government, as
recognizing a necessary difference between a search of a store, dwelling house, or other
structure in respect of which a proper official warrant readily may be obtained and a
search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not
practicable to secure a warrant, because the vehicle can be quickly moved out of the
locality or jurisdiction in which the warrant must be sought.

> 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925); see
> also Carney, 471 U.S. at 390, 105 S.Ct. 2066 (characterizing
> Carroll as being based on "a long-recognized distinction
> between stationary structures and vehicles"). Based on this
> reasoning, courts have held that vehicular mobility is a
> sufficient exigency to permit law enforcement to invoke the
> doctrine. E.g., Maryland v. Dyson, 527 U.S. 465, 466-67, 119
> S.Ct. 2013, 144 L.Ed.2d 442 (1999).

> In addition to the mobility rationale, other authority
> emphasizes that warrantless searches pursuant to the
> automobile exception are also reasonable because citizens
> possess a reduced expectation of privacy in their vehicles.
> See Carney, 471 U.S. at 393, 105 S.Ct. 2066.

> > "Automobiles, unlike homes, are subjected to
> > pervasive and continuing governmental
> > regulation and controls, including periodic
> > inspection and licensing requirements. As an
> > everyday occurrence, police stop and examine
> > vehicles when license plates or inspection
> > stickers have expired, or if other violations, such
> > as exhaust fumes or excessive noise, are
> > noted, or if headlights or other safety equipment
> > are not in proper working order."

> Id. at 392, 105 S.Ct. 2066 (quoting South Dakota v.
> Opperman, 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d
> 1000 (1976)). Thus, citizens' reasonable expectations of
> privacy in their vehicles are reduced by the far-reaching web

> of state and federal regulations that covers not only vehicles
> but also our nation's roadways. As a result, warrantless
> searches of readily mobile vehicles, when based on probable
> cause, are reasonable under the Fourth Amendment.

*United States v. Navas*, 597 F.3d 492, 497-498 (2d Cir.), *cert. denied,* 562 U.S. 954

(2010); *see also United States v. Jones*, 893 F.3d 66, 70 (2d Cir.), *cert. denied*, __ U.S.

__, 139 S.Ct. 468 (2018); *United States v. Howard*, 489 F.3d 484 (2d Cir.), *cert. denied*,

552 U.S. 1005 (2007).

This search of the defendant's automobile resulted in finding and seizing a

second stun gun under the driver's seat, crack cocaine and a "black canvas bag" that

emitted a "very strong odor of unburned marijuana."  T. 30-32.

> [I]t is well settled that it is constitutionally reasonable for law
> enforcement officials to seize "effects" that cannot support a
> justifiable expectation of privacy without a warrant, based on
> probable cause to believe they contain contraband.

*United States v. Jacobsen*, 466 U.S. 109, 121-122 (1984).

Because the black canvas bag was found in the defendant's vehicle during

the legal search of his vehicle, the deputies could legally seize that bag and open it for

purposes of determining its contents.  "If probable cause justifies the search of a lawfully

stopped vehicle, it justifies the search of every part of the vehicle and its contents that

may conceal the object of the search." *United States v. Ross, supra* at 825. It is also pointed out that the contents of the black canvas bag could be inferred by the deputies by reason of the "very strong odor of unburned marijuana" that was emitted from the bag. Similar to the "plain view" principle, the principle of "plain smell" can be applied thereby justifying a search of the contents of the bag. This olfactory evidence provided the deputies with probable cause to conduct a search of the canvas bag since the odor of marijuana alone can provide probable cause to believe that marijuana is present in the container emitting the odor. *See United States v. Staula,* 80 F.3d 596 (1st Cir.), *cert. denied*, 519 U.S. 857 ((1986); *United States v. Winters*, 221 F.3d 1039, 1042 (8th Cir. 2000); *United States v. Ramos*, 443 F.3d 304, 308 (3rd Cir. 2006); *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004).

### B. The Motorcycle Stop and Backpack Search on August 11, 2017

While on patrol duty on August 11, 2017, Deputy Kapuscinski observed the operator of a motorcycle that appeared to have a dim headlight in violation of Section 375(2)(a)(1) of the New York State Vehicle and Traffic Law ("V&T Law") and a defective muffler system inn violation of Section 375(31) of the V&T Law. As a result, he made a legal stop of this vehicle when he followed it and turned on his emergency lights. The United States Supreme Court has expressly held that "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996).

As the Court of Appeals stated in *Scopo*:

> When an officer observes a traffic offense - however minor -
> he has probable cause to stop the driver of the vehicle.
> (Internal quotation marks and citations omitted).  The fact that
> the police [choose] to wait until [the defendant] stopped . . . to
> arrest him, or that traffic arrests were not necessarily part of
> their usual duties . . . does not negate the fact that they
> directly observed [the defendant] violating the traffic laws and
> thus had probable cause to arrest him.

*United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994).

The motorcycle pulled into the driveway at 192 Park Street, a location that Deputy Kapuscinski knew "was on the radar screen for narcotics dealing."  T. 58, 88.

While in the process of conducting his investigation of this motorcycle operation in violation of the V&T Law, Deputy Kapuscinski observed the operator of the motorcycle dismount and quickly remove a backpack from his person and throw it in some weeds "as if he was trying to hide the backpack from [Deputy Kapuscinski]."  T. 59, 65.  The deputy recognized this motorcycle operator as the defendant whom he had previously encountered on March 23, 2017 when the defendant was arrested and found to be in possession of illegal narcotics and two stun guns.  T. 59-60.  As a result, these events certainly provided "reasonable suspicion" for Deputy Kapuscinski to further investigate what was occurring with the defendant.  *Terry v. Ohio*, 392 U.S. 1 (1968).  As part of his investigation, Deputy Kapuscinski could legally question the defendant about

the backpack that he saw the defendant discard in a surreptitious way "as if he was trying to hide [it] from [the deputy]."  T. 59, 65.  The deputy's suspicions were further heightened when the defendant kept changing his story about where he was coming from, who he had been with and his attempt to keep himself between the backpack and Deputy Kapuscinski.  T. 89, 92, 97-98.  Since the backpack was in "plain view" of the deputy while lying on the open ground in some weeds, the deputy could legally pick it up.  Once he did pick it up, he smelled the odor of marijuana, and the defendant's attempt to grab the backpack from him created an "officer safety" situation which permitted the officer to put the defendant in the patrol car because Deputy Kapuscinski had no way of knowing at this time if the backpack contained a weapon.  T. 69, 95, 97-98.  A potential hidden weapon in the backpack was certainly in the reach of the defendant when he attempted to grab the backpack from Deputy Kapuscinski.  That action by the defendant would have justified a search of the backpack by Deputy Kapuscinski.  *See Chimel v. California*, 395 U.S. 752, 762-763 (1969).  However, it is not necessary to rely on that type of search for purposes of resolving the defendant's motion to suppress use of the evidence seized from the backpack by Deputy Kapuscinski.  Once the deputy smelled the odor of marijuana being emitted from the backpack, he had probable cause to believe that marijuana was present inside the backpack.  *United States v. Staula*, 80 F.3d 596 (1st Cir.), *cert. denied*, 579 U.S. 857 (1996); *United States v. Winters*, 221 F.3d 1039, 1042 (8th Cir. 2000); *United States v. Ramos*, 443 F.3d 304, 308 (3rd Cir. 2006); *United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004).  A search of the backpack

resulted in the seizure of marijuana "along with a white substance that appeared to be crystal methamphetamine, clear plastic baggies with the white substances, some paraphernalia, Suboxone strips, papers for smoking marijuana and methamphetamine packaging material."  T. 69, 71.  *See* Government Exhibits 2A-2I.  "[I]t is well settled that it is constitutionally reasonable for law enforcement officials to seize 'effects' that cannot support a justifiable expectation of privacy without a warrant, based on probable casue to believe they contain contraband."  *United States v. Jacobsen*, 466 U.S. 109, 121-122 (1984).

## CONCLUSION

Based on the foregoing, it is hereby recommended that the defendant's motion to suppress use of the evidence seized from the defendant's automobile on March 23, 2017 and from the backpack on August 11, 2017 be in all respects denied.

It is hereby **ORDERED** pursuant to 28 U.S.C. ' 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this

Report, Recommendation and Order in accordance with the above statute,

Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments,
case law and/or evidentiary material which could have been, but were not presented to
the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co., Inc. v.
Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).  **Failure
to file objections within the specified time or to request an extension of such time
waives the right to appeal the District Judge's Order.**  *Thomas v. Arn*, 474 U.S. 140
(1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for
the Western District of New York, "written objections shall specifically identify the
portions of the proposed findings and recommendations to which objection is made and
the basis for such objection and shall be supported by legal authority."

22

**Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2 (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

DATED:     Buffalo, New York
              February 26, 2019

*S/ H. Kenneth Schroeder, Jr.*
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**